# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                   Plaintiff,<br><br>v.<br><br>RAMKUMAR V. RAYAPUREDDY,<br><br>                                   Defendant. | **COMPLAINT**<br><br>**22 Civ.** ___1592___ (    )<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "SEC") files this complaint against Defendant Ramkumar V. Rayapureddy ("Rayapureddy") and alleges as follows:

## SUMMARY

1.     This case involves insider trading by Rayapureddy and his former work colleague and close friend Dayakar R. Mallu ("Mallu") in the securities of Mylan N.V. ("Mylan" or the "Company").

2.     Between September 2017 and July 2019, Rayapureddy unlawfully tipped Mallu material nonpublic information concerning the Company's financial results, an acquisition, and at least one drug application approval by the U.S. Food and Drug Administration ("FDA"), knowing that, or recklessly indifferent to whether, Mallu would trade on such information.

3.     Mallu then unlawfully traded on that information, illicitly gaining at least $7,264,008 while avoiding losses of $703,337.

4.     In exchange for the tips, Mallu shared a portion of his illicit trading profits with Rayapureddy.

5.      By engaging in the conduct described in this complaint, Rayapureddy violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act Section 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

7.      Venue lies in this District under Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Western District of Pennsylvania.  Rayapureddy resides and works in the Western District of Pennsylvania, and improperly tipped Mallu material nonpublic information about Mylan, a company that is headquartered in the Western District of Pennsylvania.

## DEFENDANT

8.      **Rayapureddy**, age 54, resides in Pittsburgh, Pennsylvania.  Rayapureddy was hired by Mylan in 2014, ultimately rising to the rank of Global Chief Information Officer ("CIO") in January 2016.  Rayapureddy holds the same position today at Mylan's successor company, Viatris, Inc. ("Viatris").  Rayapureddy was a close friend and colleague of Mallu when Mallu was employed at Mylan, and the two remained close friends after Mallu departed the Company.

## OTHER RELEVANT ENTITIES AND INDIVIDUAL

9.      **Mallu**, age 52, lives in Orlando, Florida.  Mallu began working at Mylan in May 2011.  In August 2014, he was promoted to the position of Global Producer Functions IT, and served in that role until he separated from Mylan in March 2017.

10.     **Mylan** was a pharmaceutical company registered in the Netherlands with headquarters in Canonsburg, Pennsylvania.  Until November 2020, when it merged with Upjohn Inc., Mylan's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ under the symbol "MYL."

11.     **Pfizer Inc.** ("Pfizer") is a pharmaceutical company incorporated in Delaware and headquartered in New York, New York.

12.     **Upjohn Inc.** ("Upjohn") was Pfizer's off-patent branded and generic established medicines business, which merged with Mylan in November 2020.

### TERMS USED IN THIS COMPLAINT

13.     A stock option, commonly referred to as an "option," gives its purchaser/holder the option to buy or sell shares of an underlying stock at a specified price (the "strike price") before a specified time (the "expiration").  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.  If the holder does not exercise the option prior to the expiration date, the option expires as worthless.

14.     A "call" option gives the purchaser/holder of the option the right, but not the obligation, to purchase a security at a specified strike price prior to expiration.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase prior to expiration.  If the call option's strike price is above the price at which the underlying stock is trading, the call option is considered to be "out of the money," because it would be unprofitable to exercise the call and pay more for the stock than the price for which it could be obtained in the market.  Conversely, if the strike price is below the then-current market price, the call is considered to be "in the money," because one could exercise the option, obtain the stock at the strike price, and then sell it at the higher market price for a profit.  For a given expiration month,

out of the money options are typically cheaper to buy than those that are in the money.

15.     A "put" option gives the purchaser/holder of the option the right, but not the

obligation, to sell a security at a specified strike price prior to expiration.  Generally, the buyer of

a put option anticipates that the price of the underlying security will decrease prior to expiration.

If the put option's strike price is below the price at which the underlying stock is trading, the put

option is considered to be "out of the money," because it would be unprofitable to exercise the

put and sell the stock at a lower price than the price for which it could be sold in the market.

Conversely, if the strike price is above the then-current market price, the put is considered to be

"in the money," because one could exercise the option and sell the stock at the higher strike price

for a profit.  For a given expiration month, out of the money options are typically cheaper to buy

than those that are in the money.

## FACTUAL ALLEGATIONS

### I.     Rayapureddy Learned Material Nonpublic Information

16.     At all times pertinent to this complaint, through his position at Mylan,

Rayapureddy learned material nonpublic information relating to Mylan and its business, financial

performance, products, and potential corporate transactions, including the information discussed

in more detail in this complaint that he tipped to Mallu.

### II.     Rayapureddy Tipped Material Nonpublic Information in Violation of a Duty Owed to Mylan's Shareholders and the Company

17.     At all times pertinent to this complaint, Rayapureddy owed a duty to Mylan's

shareholders and the company to maintain the confidentiality of material nonpublic information

regarding Mylan.

18.     On or about October 5, 2014, Rayapureddy acknowledged receipt of Mylan's

Code of Conduct, which specifically prohibited trading in Mylan securities while in possession

of material nonpublic information about the Company or causing or recommending others to do so.  Additionally, in his employment agreement with Mylan, Rayapureddy agreed not to use or disclose any Mylan confidential information other than in the ordinary course of Mylan's business and in furtherance of its interests.

19.     At all times pertinent to this complaint, Mallu knew Rayapureddy was privy to material nonpublic information regarding Mylan.

20.     Mallu further knew that Rayapureddy was subject to a duty to keep that information confidential because, among other things, Mallu was familiar with Mylan's Code of Conduct from his time working at the Company.

21.     Notwithstanding his obligation to maintain the confidentiality of Mylan material nonpublic information, Rayapureddy tipped material nonpublic information to Mallu on at least three separate occasions after Mallu separated from Mylan, knowing that, or recklessly indifferent to whether, Mallu would trade on such information, as set forth in paragraphs 27 through 49.

22.     Rayapureddy tipped this information in exchange for a personal benefit.

23.     Rayapureddy and Mallu established a meaningfully close personal relationship while working together at Mylan between October 2014 and March 2017.

24.     The two maintained this friendship following Mallu's separation from Mylan and at all times pertinent to this complaint.  Among other things, Rayapureddy and Mallu regularly spoke on the telephone, messaged each other, and socialized in person in the United States as well as abroad, both before and after Mallu's separation from Mylan.

25.     Additionally, the two shared both work and cultural interests, visited each other's homes, and attended events with one another's families.

26.     At all times pertinent to this complaint, Rayapureddy and Mallu also had an understanding that Mallu would share a portion of his trading profits with Rayapureddy in exchange for the material nonpublic information provided by Rayapureddy.

**A.     The October 3, 2017 FDA Approval**

27.     In or around September 2017, Rayapureddy became aware, through his position at Mylan, that Mylan would soon publicly announce that the FDA had approved Mylan's Abbreviated New Drug Applications for Glatiramer Acetate Injections, which represented the first generic options for Copaxone, a multiple sclerosis treatment.

28.     Knowing or expecting the announcement to have a positive impact on Mylan's stock price, Rayapureddy tipped this information to Mallu in September 2017 both in person and during telephone calls so that Mallu could trade on it.

29.     On September 29, 2017, Rayapureddy informed Mallu by telephone that the announcement would occur soon.  That same day, Mallu purchased 1,100 Mylan call option contracts in his brokerage account for $799,945.

30.     On October 3, 2017, after the market closed, Mylan announced the FDA approval of Mylan's Abbreviated New Drug Applications for Glatiramer Acetate Injections.

31.     The following day, Mylan's share price closed at $37.80, which was $5.27 or 16.2% higher than the previous day's closing price of $32.53.  The value of Mallu's options contracts increased by $691,555.

32.     During at least one conversation concerning this announcement, Rayapureddy and Mallu confirmed their understanding that Mallu would pay Rayapureddy a portion of his trading profits in exchange for the material nonpublic information Rayapureddy provided.

**B.     The February 26, 2019 Fourth Quarter and Fiscal Year 2018 Earnings
Announcement**

33.     On January 30, 2019, Rayapureddy became aware, through his position at Mylan, that Mylan would announce financial results lower than expected by the market for the fourth quarter and full year 2018.

34.     Rayapureddy knew or expected that the financial results would have a negative impact on Mylan's stock price and, several weeks later, tipped this information to Mallu using a secure messaging and calling application so that Mallu could trade on it.

35.     On February 26, 2019, after being tipped by Rayapureddy, Mallu paid $949,888 to close 1,407 Mylan put option contracts that he had originally written the year before.  In other words, Mallu expected Mylan's share price to decrease and sought to avoid losing money on his existing position.

36.     Additionally, that same day, Mallu sold 5,502 Mylan call option contracts, earning $3,058,148, and used those premiums to purchase 7,074 Mylan put option contracts, including one series that expired only three days later, for $2,367,103.  Mallu made these trades to profit on the decrease in Mylan's share price that he expected to occur.

37.     On February 26, 2019, after the market closed, Mylan announced fourth quarter and full year 2018 financial results that were lower than expected by the market.  Additionally, the Company projected 2019 guidance below analysts' estimates.

38.     The following day, Mylan's share price closed at $26.01, which was $4.52 or 15.06% lower than the previous day's closing price.

39.     By closing his existing put option contracts before the announcement, Mallu avoided losses of $703,337.

40.     Additionally, the negative news announced by Mylan caused the value of Mallu's newly opened options contracts to increase by $4,298,040.

**C.     The July 29, 2019 Merger Announcement**

41.     On May 2, 2019, the Mylan Board of Directors was contacted by Pfizer management concerning a possible combination of Mylan and Upjohn, Pfizer's off-patent branded and generic established medicines business.

42.     On May 8, 2019, representatives of Mylan and Pfizer discussed the possible business combination and the need for each to conduct due diligence in order to evaluate the transaction.

43.     Over the next several weeks, Mylan granted Pfizer and its advisors access to a virtual data room containing proprietary information about Mylan and its business operations.

44.     Rayapureddy was involved in integration planning and due diligence for Mylan relating to the transaction with Pfizer and understood that the possibility of a business combination with Pfizer and all related discussions and due diligence was nonpublic, confidential information.

45.     Rayapureddy tipped Mallu about the impending merger, conveying to Mallu that he believed the merger would be well received and have a positive impact on Mylan's stock price, and periodically updated Mallu on the progress of the negotiations.  Rayapureddy knew that, or was recklessly indifferent to whether, Mallu would trade on such information.

46.     Rayapureddy and Mallu discussed the transaction several times using a secure messaging and calling application and, in mid-July 2019, Rayapureddy informed Mallu that Mylan would soon announce the transaction with Pfizer.

47.     On the basis of that information, between July 18, 2019 and July 23, 2019, Mallu purchased 13,003 Mylan call option contracts for $8,412,432.

48.     On July 29, 2019, before the market opened, Mylan and Pfizer jointly announced that Mylan would merge with Upjohn, Pfizer's off-patent branded and generic established medicines business, to create a new pharmaceutical company.

49.     That day, Mylan's share price closed at $20.78 per share, which was $2.32 or 12.57% higher than the prior trading day's closing price.  The value of Mallu's options contracts increased by $2,274,413.

## III.    Mallu Makes Cash Payments to Rayapureddy in Exchange for Material Nonpublic Information Concerning Mylan

50.     On several occasions following Mallu's trades, Mallu personally made or directed others to make payments in Indian rupees to Rayapureddy or one or more individuals Rayapureddy designated, in exchange for the material nonpublic information concerning Mylan that Rayapureddy had tipped to Mallu.

51.     Rayapureddy directed Mallu to make these payments in person, in India, in cash in order to avoid detection.

## IV.    Rayapureddy Violated the Federal Securities Laws

52.     As detailed above, the information about the announcements Rayapureddy tipped to Mallu was material and nonpublic.  A reasonable investor would have viewed the information as being important to his or her investment decision.

53.     As a corporate insider, Rayapureddy owed a duty to Mylan's shareholders.

54.     Pursuant to Mylan's Code of Conduct, Rayapureddy also owed a duty to Mylan not to tip material nonpublic information to any other person so that they could trade in Mylan securities on the basis of the information.

55.     In breach of his duty owed to shareholders of Mylan and the company, Rayapureddy knowingly or recklessly tipped Mallu material nonpublic information concerning

Mylan's drug approvals, financial performance, and merger with Upjohn, knowing that, or recklessly indifferent to whether, Mallu would trade on this information.

56.     Rayapureddy and Mallu knew, or were reckless in not knowing, that Rayapureddy breached this duty by tipping Mallu material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn, while knowing that, or being recklessly indifferent to whether, Mallu would trade on this information.

57.     Rayapureddy and Mallu shared a meaningfully close personal relationship.

58.     Rayapureddy received financial payments from Mallu as a "quid pro quo" in exchange for tipping material nonpublic information.

59.     Rayapureddy received a personal benefit in exchange for tipping material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn to Mallu.

60.     Mallu knew, consciously avoided knowing, was reckless in not knowing, or should have known that Rayapureddy disclosed the information in breach of that duty and that Rayapureddy received a personal benefit.

61.     When Rayapureddy tipped the material nonpublic information to Mallu, Mallu assumed the duty to maintain the confidentiality of the information.  Mallu breached this duty by knowingly or recklessly trading on the material nonpublic information.

62.     Rayapureddy knew, or was reckless in not knowing, that it was a violation of the securities laws to tip Mallu material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn.

63.     Mallu knew, or was reckless in not knowing, that it was a violation of the securities laws to trade on the basis of material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn.

**CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

64.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 63.

65.     By engaging in the conduct described above, Rayapureddy, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has

a)     employed one or more devices, schemes, or artifices to defraud;

b)     made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c)     engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66.     By reason of the foregoing, Rayapureddy has violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Permanently restraining and enjoining Rayapureddy from directly or indirectly engaging

in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Rayapureddy to disgorge, with prejudgment interest, all ill-gotten gains

received, directly or indirectly, from the activities set forth in this Complaint, pursuant to

21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

### III.

Ordering Rayapureddy to pay a civil monetary penalty pursuant to Section 21A of the

Exchange Act [15 U.S.C. § 78u-1];

### IV.

Permanently prohibiting Rayapureddy from serving as an officer or director of any

company that has a class of securities registered under Section 12 of the Exchange Act [15

U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## V.

Granting any other and further relief this Court may deem just and proper.


Respectfully submitted.


Dated: November 10, 2022


Christopher R. Kelly (NY 4247722)
Gregory R. Bockin
Brendan P. McGlynn
Matthew B. Homberger
Christine R. O'Neil
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3741 (Kelly)
kellycr@sec.gov